IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KA TOGETHER, INC.,

      Plaintiff,

v.

ASPEN SPECIALTY INSURANCE
COMPANY,

      Defendant.

CIVIL ACTION
NO. 18-142

**OPINION**

**Slomsky, J.**                                                                                 **January 24, 2019**

**I.    INTRODUCTION**

On December 14, 2017, Plaintiff KA Together, Inc. ("Plaintiff" or "KA Together") filed a Complaint in the Delaware County Court of Common Pleas against its insurer, Defendant Aspen Specialty Insurance Company ("Defendant" or "Aspen"), alleging claims for breach of contract and bad faith stemming from Defendant's denial of an insurance claim made by Plaintiff for losses incurred at its real property located at 21-39 69th Street, Upper Darby, Pennsylvania (the "Property"). Plaintiff filed the insurance claim for water damage caused by two individuals who had been residing in a third-floor apartment in the Property. On January 11, 2018, Defendant timely removed the case to this Court.

Before the Court is Defendant's Motion for Summary Judgment as to both of Plaintiff's claims. Defendant argues that Plaintiff's claims are barred by the "entrustment exclusion" of Plaintiff's insurance policy, which expressly excludes coverage for all losses resulting from dishonest or criminal acts by persons to whom Plaintiff entrusts the Property. (Doc. No. 15-1.) In opposing summary judgment, Plaintiff contends that the entrustment exclusion does not apply

1

because Plaintiff never entrusted the Property to the two individuals responsible for causing the water damage. (Doc. No. 16-2.) For the reasons that follow, the Court will grant Defendant's Motion (Doc. No. 15).

## II.      BACKGROUND

KA Together is a corporation that owns the real property located at 21-39 69th Street in Upper Darby, Pennsylvania (the "Property"). (Doc. No. 1-1.) The Property is a mixed commercial and residential building, with "Lou's Loans" operating out of the storefront and second floor, and a rental apartment on the third floor. (Doc. No. 15-3 at 12:18-13:10.) KA Together insures the Property with Defendant pursuant to a Commercial Property Policy (the "Policy"). (Doc. No. 15-5.) The Policy contains several exclusions from coverage, including an "entrustment exclusion" which reads as follows:

> 2. We will not pay for loss or damage caused by or resulting from any of the following:
>
> * * *
>
> h. Dishonest or criminal act by you, any of your partners, members, officers, managers, employees (included leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:
>
> (1) Acting alone or in collusion with others; or
> (2) Whether or not occurring during the hours of employment
>
> This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

(Doc. No. 15-5 at 32-33.) Since February 2015, KA Together has contracted with Sang Mook Ha, Jr. ("Ha"), employing Ha as the manager of the Property. (Id. at 9:7-9, 9:21-25.)

2

On February 17, 2013, KA Together executed a lease agreement for the Property's third-floor apartment with Camilo Moreno Marquez ("Marquez").[1] (Doc. No. 15-4.) The agreement prohibited Marquez from transferring the lease or subletting the Property to any person without first obtaining written permission from Plaintiff. (Id. at 10.) After Marquez executed the lease agreement, a female by the name of Stephanie moved into the apartment with him. (Doc. No. 15-3 at 23:11-24:3.) For years, Marquez timely paid the rent each month. (Id. at 28:12-29:8.) Beginning with the payment due on July 1, 2016, however, Marquez and Stephanie stopped paying rent. (Id.)

On July 20, 2016, following the expiration of the grace period for Marquez's monthly rental payment, Ha visited the apartment and hand-delivered to Stephanie a ten-day notice to pay or leave the premises. (Id.; id. at 48:12-14.) Stephanie promised Ha that she and Marquez would pay the past-due rent, but Ha never received the July payment. (Id. at 29:25-30:2.) At some point in late July or early August, Marquez and Stephanie were arrested at the apartment on weapons charges and removed from the Property. (Id. at 30:7-11, 35:15-20.)

Ha had not been made aware of the arrest and was still under the impression that Marquez and Stephanie were residing in the third-floor apartment when he received a phone call from an individual claiming he had signed a lease for the apartment with Stephanie. (Id. at 40:20-41:6.) Ha told the individual on the phone that Stephanie had no authority to lease the apartment because she was not the owner of the Property or "even a signed tenant." (Id. at 41:2-25.) Ha urged the

---

[1] Marquez originally executed the lease agreement with Plaintiff for a one-year term. (Doc. No. 15-4 at 15.) The lease agreement provided that at the end of the one-year period, the lease would automatically renew on a month-to-month basis if neither the landlord nor the tenant gave 30 days written notice to terminate the lease. (Id.) Because neither Marquez nor Plaintiff gave written notice to end the lease, Marquez continued to reside in the Property's third-floor apartment past the original lease term.

3

individual "not to do anything with" Stephanie and told him that any lease agreement signed between him and Stephanie was invalid and would not be accepted. (Id. at 41:24-25, 42:19-21.)

In early August 2016, shortly after receiving this phone call, Ha went to the apartment with a contractor to change the locks. (Id. at 37:7-13.) When Ha arrived, however, he encountered two individuals living in the apartment, Patrick Wideman ("Wideman") and Tiana Barksdale ("Barksdale"). (Id. at 37:16-24.) Wideman identified himself to Ha as the individual who had previously called him about leasing the apartment from Stephanie. (Id. at 49:25-50:4.) Ha informed Wideman again that the lease he signed with Stephanie was invalid and that he and Barksdale would need to vacate the apartment. (Id. at 50:6-9.)

Wideman and Barksdale agreed to move out of the apartment, but asked Ha for some time to do so. (Id. at 50:17-51:1.) Ha agreed and allowed Wideman and Barksdale to remain in the apartment for two weeks. (Id.) At the end of the two-week period, on or around August 24, 2016, Barksdale called Ha to request more time and Ha permitted her and Wideman one more week in the apartment. (Id. at 52:23-54:21.) One week later, on or around September 1, 2016, Barksdale called Ha begging for three more days. (Id. at 54:24-55:6.) Ha agreed. (Id.)

On September 10, 2016, once three days had past and having heard nothing further from Wideman or Barksdale, Ha went to the Property with a contractor to change the locks at the apartment. (Id. at 55:10-12; 57:5-14.) When Ha arrived, he found Wideman and Barksdale still in the apartment but "packing and moving things down to the street level." (Id. at 57:19-22.) Upon seeing this, Ha allowed Wideman and Barksdale another day, until September 11, 2016, to vacate the Property. (Id.)

On September 12, 2016, Ha received a phone call from the owner of Lou's Loans, Stan Meyerson ("Meyerson"), the business that operates on the first and second floors of the Property.

(Id. at 12:18-13:4.) Meyerson told Ha that "[w]ater was flowing and flooding his store as well as his office on the second floor." (Id. at 13:9-14.) Ha immediately went to the Property and found "three sources of water running with the drains blocked" in the third-floor apartment. (Id. at 16:10-13.) More specifically, Ha found: (1) a plastic container blocking the kitchen sink drain; (2) a cloth shoved into the bathroom sink drain; and (3) the bathtub drain turned to the "closed" position. (Id. at 17:16-21, 18:8-12, 18:14-25.) Ha called the police and filed an incident report. (Doc. No. 16-6.)

Shortly thereafter, Plaintiff submitted a claim to Defendant for the water damage incurred at the Property. Plaintiff believed the damage was covered under its Policy as an act of vandalism.[2] After reviewing the claim, however, Defendant denied coverage based on the entrustment exclusion of the Policy. Defendant concluded that Plaintiff, through Ha, had entrusted the third-floor apartment to Barksdale and Wideman, and that that this entrustment caused the loss to the Property. (Doc. No. 15-2 ¶ 5.) Consequently, because the claim for the water damage fell within this exclusionary term of the Policy, coverage was denied.

On December 14, 2017, Plaintiff filed this action, alleging that Defendant's denial of coverage for the water damage to the Property was in breach of the Policy and in bad faith. (Doc. No. 1-1 at 1-10.) On January 11, 2018, Defendants timely removed the Complaint to federal court based on diversity of citizenship jurisdiction. (Doc. No. 1.) On July 26, 2018, following several months of fact discovery, Defendant filed this Motion for Summary Judgment. (Doc. No. 15.)

---

[2] The record on summary judgment does not include evidence of Plaintiff's insurance claim to Defendant, nor of Defendant's denial. Without specific dates and documents to that effect, the Court will presume an insurance claim was made to Defendant soon after Plaintiff discovered damage to the Property. And since this case arises from Defendant's denial of coverage, the Court will also presume that Defendant timely notified Plaintiff in writing of its denial of coverage.

**III.     STANDARD OF REVIEW**

Granting summary judgment is an extraordinary remedy. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)). A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Kaucher v. Cty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). For a fact to be considered "material," it "must have the potential to alter the outcome of the case." Favata, 511 F. App'x at 158. Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (alteration in original) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009)). The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. Anderson, 477 U.S. at 247-49. Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the court must credit the nonmoving party's evidence over that presented by the moving party. Id. at 255. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the

6

potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. Id. at 250.

IV.    ANALYSIS

There is no dispute over the facts of this case.[3] Even construing the facts in the light most favorable to Plaintiff as the non-moving party, Plaintiff and Defendant agree to the material facts surrounding Wideman and Barksdale's residency in the third-floor apartment and that Wideman and Barksdale caused the water damage to the Property. The issue before the Court is whether Barksdale and Wideman meet the definition of persons "entrusted" with the Property for purposes of the Policy's entrustment exclusion. For the reasons discussed infra, the Court is satisfied that Barksdale and Wideman were entrusted with the Property and that, consequently, Defendant is entitled to judgment as a matter of law on Plaintiff's breach of contract and bad faith claims.

    A.    **Defendant's Denial Of Coverage Based On The Entrustment Exclusion Is Not In Breach Of Plaintiff's Policy**

Defendant seeks summary judgment with respect to Plaintiff's breach of contract claim, arguing that it properly denied insurance coverage to Plaintiff for the water damage to the Property based on the entrustment exclusion of the Policy. Plaintiff makes two arguments in opposition. Plaintiff argues that the entrustment exclusion cannot be enforced because it is ambiguous and must therefore be construed against Defendant as the drafter of the Policy. (Doc. No. 16-2 at 9.) Plaintiff also argues that, regardless of ambiguity, Defendant improperly denied coverage based

---

[3] Although Plaintiff contends in its Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment that it has "presented additional facts that show . . . dispute" over whether Barksdale and Wideman were entrusted with the Property, Plaintiff's only source of material facts comes from the Examination Under Oath ("EUO") taken of Mr. Ha. (Doc. No. 15-3.) Without more, there is no genuine dispute of material facts based on the EUO of Mr. Ha because Defendant has accepted as true the EUO testimony for purposes of its Motion. (Doc. Nos. 15-1, 19.)

7

on the entrustment exclusion because Ha never entrusted Wideman and Barksdale with the third-floor apartment. The Court will address Plaintiff's arguments seriatim.

### 1. The Entrustment Exclusion Is Not Ambiguous And Must Be Enforced

Plaintiff argues the entrustment exclusion of the Policy is ambiguous for two reasons: (1) the word "entrust" is not defined within the Policy; and (2) the exclusion is inconsistent because it applies to some categories of people entrusted with the Property but not others. (Doc. No. 16-2 at 9-10.) For the reasons discussed below, both arguments lack merit.

"Insurance policies are contracts, and the rules of contract interpretation provide that the mutual intention of the parties at the time they formed the contract govern its interpretation." Am. & Foreign Ins. Co. v. Jerry's Sports Ctr., Inc., 606 Pa. 584, 2 A.3d 526, 540 (2010) (citations omitted). In interpreting an insurance contract, the Court must "ascertain the intent of the parties as manifested by the terms used in the written insurance policy." Donegal Mut. Ins. Co. v. Baumhammers, 595 Pa. 147, 155, 938 A.2d 286 (2007) (citing 401 Fourth Street, Inc. v. Investors Ins. Grp., 583 Pa. 445, 454, 879 A.2d 166, 171 (2005)).

"Under Pennsylvania law, an insurance policy must be read as a whole and construed according to the plain meaning of its terms." Selective Way Ins. v. Travelers Prop. Cas. Co. of Am., 724 F. Supp. 2d 520, 525 (E.D. Pa. 2010) (citing C.H. Heist Caribe Corp. v. Am. Home Assurance Co., 640 F.2d 479, 481 (3d Cir. 1981)). Commonly used terms "are to be construed in their natural, plain, and ordinary sense, and courts may inform their understanding of such words by consulting a dictionary." Id. (citing Madison Constr. Co. v. Harleysville Mut. Ins. Co., 557 Pa. 595, 735 A.2d 100, 108 (1999)). Ambiguous terms on the other hand must be "construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage.'" Colella v. State Farm Fire & Cas. Co., 407 Fed. App'x 616, 619 (3d Cir. 2011) (quoting 401 Fourth St., 583 Pa. 445, 879 A.2d 166, 171).

In addition, courts must not read ambiguity into insurance contracts. Insurance contracts are only ambiguous if the contractual language "'is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" Id. (quoting Madison Constr. Co. v. Harleysville Mut. Ins. Co., 557 Pa. 595, 735 A.2d 100, 106 (1999) (citation and internal quotation marks omitted)).

Here, Plaintiff argues the entrustment exclusion is ambiguous because the term "entrust" is not defined. (Doc. No. 16-2 at 9-10.) The Court disagrees. The relevant portion of the Policy's entrustment exclusion provides:

> 2. We will not pay for loss or damage caused by or resulting from any of the following:
>
> * * *
>
> h. Dishonest or criminal act by you, any of your partners, members, officers, managers, employees (included leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:
>
> (1) Acting alone or in collusion with others; or
> (2) Whether or not occurring during the hours of employment
>
> This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

(Doc. No. 15-5 at 32-33.)

The term "entrust", as used in this context, is not ambiguous. Ambiguity results only when a term is susceptible to multiple different meanings. Hutchinson v. Sunbeam Coal Corp., 513 Pa. 192, 200, 519 A.2d 385, 390 (1986). The term "entrust" is a commonly-used term, capable of accepted and ordinary meaning: "to confer a trust on," or "to commit to another with confidence." See Grover Commercial Enters., Inc. v. Aspen Ins. UK, Ltd., 202 So.3d 877 (Fla. Dist. Ct. App. 2016) (citing Merriam-Webster Collegiate Dictionary (11th ed. 2005) (internal quotation omitted)). In fact, Plaintiff seemingly accepts this meaning by relying on the same Merriam-

9

Webster dictionary definition of "entrust" to argue that no such entrustment occurred between Ha, Barksdale and Wideman. (Doc. No. 16-2 at 9-10.) Thus, the word "entrust", though undefined in the Policy, is not an ambiguous term.

Next, Plaintiff argues the entrustment exclusion is ambiguous because it applies to some categories of people entrusted with the Property and not others, leaving open the possibility that the exclusion would not apply to Wideman and Barksdale even if they could be considered true tenants of the third-floor apartment. (Id.) More specifically, Plaintiff contends that because the entrustment exclusion does not explicitly refer to criminal or dishonest acts by tenants, tenants might not be included within the exclusion. Plaintiff further contends that if tenants are not encompassed within the entrustment exclusion, the exclusion as a whole is inconsistent because it does not apply to an entire category of persons who would otherwise be considered entrusted. (Id.) The Court disagrees with Plaintiff's interpretation.

Contrary to Pennsylvania law, Plaintiff's suggested interpretation of the entrustment exclusion would have this Court read into the provision an ambiguity where there is none. The entrustment exclusion broadly applies to dishonest or criminal acts by "anyone to whom [Plaintiff] entrust[s] the property for any purpose." (Doc. No. 15-6 at 4.) The only exception within this exclusion is for "acts of destruction by your employees (including leased employees)." (Id.) While "tenants" are not explicitly referenced as a category of persons entrusted, the Court is satisfied that "tenants" nevertheless fall within the broad scope of the exclusionary language as "anyone to whom [Plaintiff] entrust[s]." Any other interpretation would be contrary to the plain meaning of the Policy.

Moreover, other courts tasked with interpreting similar (if not identical) entrustment exclusions have found tenants to be included in the general prohibitory language. See e.g., K.V.G.

10

Props., Inc. v. Westfield Ins. Co., 296 F. Supp. 3d 863 (E.D. Mich. 2017); United Specialty Ins. Co. v. Barry Inn Realty Inc., 130 F. Supp. 3d 834 (S.D.N.Y. 2015). In KVG, the court granted summary judgment to the defendant insurance company, finding that the damage caused to plaintiff's property by its tenant's illegal marijuana business was not covered under the insurance policy based on the entrustment exclusion in the policy:

> Thus, KVG entrusted the units to each of the tenants, trusting that the tenants would abide by the obligations in the leases. The tenants' use of the units to grow marijuana was illegal or at the very least dishonest. Westfield is entitled to summary judgment on the grounds that the damage to the units is excluded under the illegal or dishonest acts exclusion.

296 F. Supp. 3d at 869. The court in United Specialty, another case involving an illegal marijuana business, also ruled that the insurance company properly denied coverage based on an entrustment exclusion for damage caused by the insured's tenant:

> [I]t is clear from the record that Barry intended to surrender, deliver, or transfer possession of the Premises to Castelliano, and that it did so with confidence that it would be used for the purpose intended by Barry and as stated by Castelliano. . . . The Policy precludes coverage for "damage caused directly or indirectly by . . . [d]ishonest or criminal act[s] by . . . anyone to whom [Defendant] entrust[ed] the property" . . . . The parties agree that the damage to the Premises was caused by the acts of Barry's tenant, and that these acts were criminal and dishonest in nature. . . . Accordingly, the Policy does not provide coverage for the damage sustained as a result of Castelliano's marijuana-growing operation.

130 F. Supp. 3d at 842.

Accordingly, the Court finds that the entrustment exclusion at issue in this case applies to tenants.[4] For these reasons, the Court rejects Plaintiff's arguments regarding ambiguity. The entrustment exclusion is clear and will be applied and enforced as written.

---

[4] In support of its argument that the entrustment exclusion of the Policy is ambiguous, Plaintiff also emphasizes that the entrustment exclusion carves out an exception for acts of vandalism by Plaintiff's employees. (Doc. No. 16-2 at 10.) Plaintiff contends:

## 2. The Entrustment Exclusion Bars Plaintiff's Insurance Claim Because Ha Entrusted The Property To Wideman And Barksdale

Under Pennsylvania law, "the insurer bears the burden of proving the applicability of any exclusions or limitations on coverage, since disclaiming coverage on the basis of an exclusion is an affirmative defense." Koppers Co., Inc. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1445 (3d Cir. 1996) (citations omitted). Even construing the facts in the light most favorable to Plaintiff, the Court is satisfied here that Defendant has met its burden of proving the entrustment exclusion applies to bar coverage to Plaintiff for the damage to the Property caused by Barksdale and Wideman. The undisputed facts show that Ha entrusted the third-floor apartment to Barksdale and Wideman because (1) upon finding Wideman and Barksdale unlawfully residing in the apartment, Ha allowed them to remain in the apartment for several more weeks and (2) Ha never attempted to revoke Wideman and Barksdale's access to the apartment by taking away their keys, changing the locks, or having them removed from the Property.

As previously discussed, to "entrust" someone with property means to confer trust upon them with respect to that property. *Entrust*, Merriam-Webster Collegiate Dictionary (11th ed. 2005). While this conferring of trust can be set forth in an explicit contractual agreement, an entrustment relationship can also be created between an insured and a third party, regardless of whether they have a written or oral contract, if that requisite level of trust is established. See 3039 B Street Associates, Inc. v. Lexington Ins. Co., 483 Fed. App'x 693 (3d Cir. 2012).

---

> Certainly, the level of 'trust' conferred on an employee who goes through an application process, is vetted and ultimately hired is higher than that conferred on an unauthorized squatter. A reasonable person would assume that acts of vandalism by even a "tenant" should not be excluded. (Copied as written).

(Id.) Plaintiff's argument in this regard is unpersausive. The narrow limitation in the entrustment exclusion for acts performed by Plaintiff's own employees has no bearing on the entrustment exclusion as it applies to criminal or dishonest acts by persons to whom Plaintiff entrusts the Property, including tenants.

12

The Third Circuit Court of Appeals has recognized that an entrustment relationship can exist between a plaintiff-insured and a third party. In 3039 B Street, the plaintiff's president gave to his former employee keys to plaintiff's warehouse and permission to "clean the place up." Id. at 694. While "cleaning" the warehouse, the former employee removed several radiators from the building, leading the plaintiff to file an insurance claim for stolen property. Id. at 695. The defendant denied coverage based on a nearly identical provision in plaintiff's policy that had an exclusion for entrustment. Plaintiff sued for breach of contract and bad faith. The Third Circuit affirmed the district court's grant of summary judgment in defendant's favor, noting that:

> The cases cited by the District Court are on target. See Wagner v. Edemnify, LLC, No. 4:08-cv-299, 2009 WL 5062058, at *3 (E.D. Tex. Dec. 16, 2009) (independent contractor who was given keys and unsupervised access when hired to clean up a building was "entrusted" with its contents for purposes of an insurance policy theft exclusion); Wexler Knitting Mills v. Atl. Mut. Ins. Co., 382 Pa. Super. 405, 555 A.2d 903, 905 (1989) (finding a theft exclusion applicable to anyone entrusted with the property by the insured). . . . Like the insureds in the Wagner and Wexler cases, B Street entrusted the warehouse to a third party . . . who took advantage of the opportunity to steal the building's radiators.

Id. at 696.

In accordance with 3039 B Street and the cases cited in that decision by the Third Circuit, Plaintiff, through Ha, entrusted Wideman and Barksdale with the Property. Ha knew Wideman and Barksdale had been given keys to the third-floor apartment, and yet Ha never attempted to retrieve their keys or change the locks. In fact, Ha even allowed Wideman and Barksdale "unsupervised access" to the third-floor apartment for the duration of their stay at the Property.

F.D. Stella Prods. Co. v. General Star Indemnity Co., No. 3-5151, 2005 WL 3436388 (N.D. Ill. 2005) is another decision that supports the fact that an entrustment relationship was created between Ha, Wideman and Barksdale even though Ha never considered Wideman and Barksdale tenants of the Property. In F.D. Stella, the district court granted summary judgment to the

13

defendant insurance company after finding that the defendant had properly denied insurance coverage to plaintiff based on the entrustment exclusion of plaintiff's policy. There, the plaintiff leased restaurant equipment to a business that eventually closed, after which a new restaurant owned by "the Browns" moved into the same space and began using the leased equipment. Id. at *2. That new restaurant eventually closed and plaintiff discovered that the Browns had stolen much of the leased equipment. Id. Plaintiff filed an insurance claim for stolen property, which defendant denied based on the entrustment exclusion in plaintiff's policy. The court ruled in favor of the defendant, employing the Merriam-Webster definition of "entrust" and finding, in relevant part:

> With that definition in mind, it appears beyond question that [plaintiff] "entrusted" the subject property to the Browns when it knowingly permitted the Browns to maintain custody and control over the subject property for nearly five months while the parties attempted to negotiate a purchase or lease agreement for the subject property.

Id. at *5. The court in F.D. Stella went on to discuss the entrustment relationship more generally and why it applied to the plaintiff and the Browns:

> [Plaintiff] argues that the absence of a written contractual agreement between the parties demonstrates that [Plaintiff] and the Browns did not have the necessary relationship of trust or confidence. While a written contractual agreement would show that an entrustment had occurred, parties need not comply with the formal requirements of a contract to manifest a relationship of trust and confidence. . . . The determinative factor as to the existence of an entrustment is simply whether the insured surrendered or transferred the subject property with confidence regarding its care, use or disposal. In this case, [Plaintiff] knowingly permitted the Browns to possess and use the subject property in the operation of their business for nearly five months.

Id. at *6.

While the facts surrounding the entrustment relationship between the plaintiff and the Browns in F.D. Stella are somewhat different from the relationship here between Ha, Wideman

14

and Barksdale,[5] the decision is nevertheless instructive for what it means to "entrust" someone with property. Similar to what occurred in F.D. Stella, Plaintiff knowingly permitted Wideman and Barksdale to use its Property when Ha allowed them to reside in the third-floor apartment. Moreover, Ha surrendered the Property to Wideman and Barksdale when he gave them permission to reside in the third-floor apartment for several weeks. Although Ha surrendered the Property under the impression that Wideman and Barksdale would soon vacate the apartment, he surrendered it nonetheless. The Court is satisfied that Ha surrendered the Property because he had a level of "confidence regarding its care, use or disposal" in Wideman and Barksdale. Id. at *6.

Finally, Easy Corner, Inc. v. State Nat'l Ins. Co. Inc., 56 F. Supp. 3d 699 (E.D. Pa. 2014) is another case that further supports the conclusion that Wideman and Barksdale were entrusted with the Property. In Easy Corner, plaintiff, the owner of "Easy Corner Bar," hired a manager to run the bar pursuant to a written agreement. Id. at 701. At the end of the agreement, plaintiff decided not to renew the manager's contract. Id. Unhappy with plaintiff's decision, the manager continued to run the bar against plaintiff's wishes. Id. Eventually, plaintiff told the manager that he had to leave the bar. Id. at 702. On the manager's last day, he threw a party that destroyed the bar. Id. Plaintiff submitted a claim for the damage to its insurance company. Id. The insurance company denied coverage based on an entrustment exclusion in plaintiff's policy much like the one involved here. Id. at 701-02. The court, tasked with determining whether the manager had

---

[5] Unlike this case, the plaintiff in F.D. Stella knew from the beginning that the Browns had moved into the restaurant space, and plaintiff was in the process of negotiating a new lease agreement for the equipment with them. 2005 WL 3436388, at *2. KA Together argues these facts render F.D. Stella inapposite. (Doc. No. 16-2 at 8.) The Court disagrees. Although Plaintiff never attempted to negotiate a lease agreement with Wideman and Barksdale, the decision in F.D. Stella is still instructive. Like the plaintiff in F.D. Stella, KA Together knew (though not immediately) that Wideman and Barksdale were residing in the apartment and subsequently authorized them to stay, albeit without discussing a new lease agreement.

15

been entrusted with the bar even though plaintiff had already terminated his contract by the time he caused the damage, considered the purpose underlying entrustment exclusions:

> The purpose of an entrustment exclusion is "to exclude from the risk undertaken by the insurer those losses that arise from the 'misplaced confidence' of the insured in those to whom it entrusts the property."

Id. at 705-06 (citing Bainbridge, Inc. v. Calfarm Ins. Co., 2004 WL 2650892, at *6 (internal citation omitted)). Given this purpose, the court found that entrustment exclusions "apply even after the temporal termination of an entrustment provided that there is a causal connection between the act of entrustment and the resulting loss." Id. at 707. Consequently, the court held the insurance company was correct to deny coverage because the plaintiff had entrusted the bar to the manager even though the official entrustment relationship between them had ended by the time the manager caused the damage to the bar. Id. at 706-07.

The purpose behind entrustment exclusions, as discussed in Easy Corner, makes clear that the entrustment exclusion ought to apply in this case. Here, the undisputed facts establish that Ha entrusted the Property to Wideman and Barksdale when he found them residing in the third-floor apartment and allowed them to stay in the apartment for two weeks. That entrustment relationship continued each time Ha gave Wideman and Barksdale permission, and an extension, to remain in the apartment. Although Ha hoped from the beginning that Wideman and Barksdale would vacate the apartment, that hope does not negate the trust he otherwise conferred on Barksdale and Wideman with respect to the Property, evidenced by the fact that he never attempted to have them removed from the apartment.[6]

---

[6] Plaintiff argues that it should not be penalized for Ha failing to remove Barksdale and Wideman from the apartment because the Pennsylvania Landlord and Tenant Act of 1951 ("PLTA") strongly disfavors landlords resorting to "self-help" during an eviction process. (Doc. No. 16-2 at 4); 68 P.S. §§ 250.101-250.602. The Court is not persuaded by this argument. The PLTA sets forth a legal process by which a landlord can repossess real property from a tenant. Stewart

Ha's misplaced confidence in Wideman and Barksdale is causally connected to the damage incurred at the Property. Had Ha not allowed Wideman and Barksdale to reside in the third-floor apartment, Wideman and Barksdale would not have had the opportunity to flood the apartment and cause the water damage. In accordance with the purpose for and the language of the entrustment exclusion, Defendant was within its contractual right to exclude Plaintiff's claim for the water damage as a loss arising from a dishonest or criminal act due to "the 'misplaced confidence' of the insured in those to whom it entrusts the property." Id. at 705-06. Accordingly, the Court will grant Defendant's Motion for Summary Judgment as to Plaintiff's claim for breach of contract.

B. **Defendant's Denial Of Coverage Based On The Entrustment Exclusion Was Not In Bad Faith**

Plaintiff alleges in the Complaint that it is entitled to statutory bad faith damages because Defendant knew or should have known that denying coverage based on the entrustment exclusion of Plaintiff's policy was improper. Neither Defendant nor Plaintiff address the issue of bad faith in their respective motions on summary judgment, focusing instead on the question of entrustment and breach of contract. (Doc. Nos 15-1, 16-2, 19.) Nevertheless, and in accordance with finding Defendant did not breach Plaintiff's Policy, the Court finds that summary judgment in favor of Defendant is warranted on Plaintiff's statutory bad faith claim.

To recover for bad faith under the Pennsylvania bad faith statute, 42 Pa. Const. Stat. § 8371, the party seeking recovery "'must establish by clear and convincing evidence that the insurance company acted in bad faith without a reasonable basis for denying the claim, and that it knowingly

---

v. Phila. Housing Auth., 487 F. Supp. 2d 584, 592 (E.D. Pa. 2007). The PLTA is inapplicable here since, as Plaintiff admits, Wideman and Barksdale "were not even 'tenants.'" (Doc. No. 16-2 at 4); Snyder v. Daughterty, 899 F. Supp. 2d 391, 408 (W.D. Pa. 2012) ("'[a]gainst a trespasser in possession, the landlord has a right to the remedy of self help and is not required to revert to any legal process'") (quoting Clarenbach v. Giordano, 11 Pa. D & C. 3d 195, 198-99 (Pa. Comm. Pl. 1978)). Consequently, Ha could have undertaken self-help measures, such as changing the locks, to evict Wideman and Barksdale from the Property.

or recklessly disregarded its lack of a reasonable basis to do so.'" Reeves v. Travelers Cos., 296 F. Supp. 3d 687, 692-93 (E.D. Pa. 2017) (quoting Lockhart v. State Farm Mut. Auto. Ins. Co., 410 Fed. App'x 484, 485–86 (3d Cir. 2011)).

Notably, the court in Easy Corner considered the same type of bad faith claim as the one asserted here, and ultimately granted summary judgment in favor of defendant:

> Plaintiff has not met the burden of showing clear and convincing evidence of bad faith here. Plaintiff's argument is essentially that Defendant was in the wrong in denying coverage, and must have or should have known as much, and therefore Defendant must have acted in bad faith. But Plaintiff has pointed to no facts of record showing that Defendant's denial of coverage rose above "mere negligence or bad judgment" or that Defendant acted out of self-interest or ill will. Rather, under Plaintiff's reasoning, virtually every incorrect denial of insurance coverage would constitute bad faith merely by virtue of being incorrect.

56 F. Supp. 3d at 708.

Plaintiff's bad faith claim, like the claim in Easy Corner, is predicated on a denial of coverage theory. (See Doc. No. 1 ¶ 15.) The record is devoid of any evidence that Defendant denied coverage to Plaintiff in bad faith and, what is more, the Court has already determined that Defendant's denial of coverage was proper based on the entrustment exclusion of the Policy. Accordingly, there is no basis for finding that Defendant acted in bad faith, and summary judgment is appropriate.

V. **CONCLUSION**

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment (Doc. No. 15). An appropriate Order follows.